UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAVELIN GLOBAL COMMODITIES (UK) LTD. and BLUEGRASS COMMODITIES, LP,<br><br>Plaintiffs,<br>v.<br><br>LEXINGTON COAL COMPANY, LLC,<br><br>Defendant. | **ORDER GRANTING SUMMARY JUDGMENT**<br><br>Civil Action No. 21-cv-787-AKH |

ALVIN K. HELLERSTEIN, U.S.D.J.:

### FACTUAL BACKGROUND

*The Underlying Contractual Dispute*

Plaintiffs Javelin Global Commodities (UK) Ltd and Bluegrass Commodities LP filed suit alleging breach of two contracts related to the marketing and sale of coal produced by Defendant Lexington Coal Company, LLC and its affiliates: (i) a contract in which Lexington Coal granted Plaintiff Bluegrass the exclusive right to market and sell thermal coal, and (ii) a master coal purchase and sale agreement under which Lexington Coal agreed to sell metallurgical coal to Plaintiff Javelin. Bluegrass sought specific performance of Defendant's obligations, and damages for lost sales commissions and lost exclusive marketing rights. Javelin sought damages for Defendant's failure to deliver metallurgical coal ordered by Javelin pursuant to the master coal purchase and sale agreement. Defendant Lexington counterclaimed, alleging breach of contract and breach of duty of good faith and fair dealing.

*The Settlement Term Sheet and Subsequent Communications*

Plaintiffs and Defendant agreed on January 25, 2022 to settle the lawsuit by a Settlement Term Sheet. The opening language of the Settlement Term Sheet stated "[the parties] agree to

1

the following terms in connection with the claims asserted in the lawsuit between the parties." Term Sheet at 1. The Term Sheet specified the schedule, time, and location of delivery of three sets of thermal coal by Lexington to Javelin, and "incorporate[ed] the commercial terms of the original confirmations" of thermal coal deliveries. *Id.* The three original Thermal Coal Confirmations established the prices: $48 per ton for Lex19(TP)0031; $34 per ton for Lex20(TP)0006; and $43 per ton for Lex21(TP)0001. *See* Exs. 10, 11, and 12 to the Bell Decl., ECF No. 114. In a deposition, Jeremy Hoops, President and CEO of Lexington, acknowledged that the Settlement Term Sheet, by incorporation of the terms of the original Thermal Coal Confirmations, constituted an agreement on price. *See* Dep. of Jeremy Hoops at 310-13, Ex. 5 to the Bell Decl., ECF No. 114.

As to Bluegrass' exclusive coal marketing rights, the Settlement Term Sheet provided that the parties "agree[d] to settle all claims . . . for the cash consideration of $750,000." Term Sheet at 2. Lastly, the Settlement Term Sheet provided that Lexington would deliver "one train of high vol B metallurgical coal" to Javelin in June 2022 at the price of $130 per ton, and Javelin had the option to purchase an additional train of metallurgical coal from Lexington at the price of $150 per ton for delivery in August 2022. *Id.* The final section of the Settlement Term Sheet noted that "Lexington and Javelin anticipate executing a complete Settlement Agreement based on the terms set forth herein and will contain mutual releases." *Id.*

The CEOs of Javelin and Lexington signed the Settlement Term Sheet, and filed a letter on March 3, 2022 informing the Court of the agreement and noting that the terms of the settlement agreement had been principally agreed to. ECF No. 50. On April 6, 2022, however, Plaintiffs submitted a letter notifying the Court that the parties had not finalized their settlement because "Lexington want[ed] to renegotiate the price of [high volume B metallurgical] coal."

ECF No. 52. As Mr. Hoops acknowledged in his deposition, Lexington had not contemplated the continuing changing price of coal after the execution of the Settlement Term Sheet, and wished to renegotiate price. *See* Dep. of Jeremy Hoops at 315-17, Ex. 3 to the Bell Decl., ECF No. 102. The parties then engaged in further settlement negotiations.

In early June 2022, Plaintiffs and Defendant exchanged emails about the terms of the settlement agreement. In a June 2, 2022 email to Defendant's attorney Jeffrey Criswell, Plaintiffs' attorney Robert Bell laid out a list of terms and asked for confirmation from Defendant "that these are the terms of the agreement" so that Plaintiffs could "revis[e] the settlement agreement." E-mail from Robert Bell to Jeffrey Criswell (June 2, 2022), Ex. 11 to ECF No. 71. Most relevantly, Mr. Bell listed the following terms: "1. the agreed upon delivery schedule for the thermal coal," referencing the Settlement Term Sheet; "2. payment of $750,000 for release of the exclusive marketing deal;" and "3. payment of $1,000,000 for Lex09 and Lex10," both referring to metallurgical coal. *Id.* Mr. Criswell responded on behalf of Defendants in an email on June 6, 2022, stating: "Lexington is an [sic] agreement with the terms set forth in your 6/2/2022 e-mail." E-mail from Jeffrey Criswell to Robert Bell (June 6, 2022), Ex. 12 to ECF No. 71.

***Recent Procedural History***

In a December 20, 2022 order, I held that the Settlement Term Sheet constituted a "binding contract" which contained an "agree[ment] to all material terms," even though further negotiations were contemplated, and that the subsequent email exchange in early June 2022 did not constitute a superseding contract. ECF No. 82. However, following a motion for reconsideration and from the parties submissions, I considered that the issues were not yet completely settled and, in a February 28, 2023 order, granted Defendant's motion for

3

reconsideration and re-opened the proceedings, specifically, to settle if there had been an agreement on the price of thermal coal and the admissibility, in the context of the privilege surrounding settlement proceedings, of the June 2022 emails. ECF No. 90.

Plaintiffs now bring a Motion for Summary Judgment, arguing that the Settlement Term Sheet is enforceable and constitutes a binding agreement as to the delivery of thermal coal, the delivery of metallurgical coal, and the release of all claims and counterclaims based on the marketing agreement.

## STANDARD OF REVIEW

A court should grant summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence in the light most favorable to the party opposing summary judgment ... draw all reasonable inferences in favor of that party, and ... eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). New York law applies to this case. Under New York law, settlement agreements are contracts and are construed according to principles of contract law. *See Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). "The essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages

resulting from the breach." *PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc.*, 16 N.Y.S.3d 298, 299-300 (2d Dept. 2015). The burden is on the plaintiff to show "by a preponderance of the credible evidence" that defendant breached its contractual duties. *See e.g., A. Montilli Plumbing & Heating Corp. v. Valentino*, 935 N.Y.S.2d 647, 649 (2d Dept. 2011). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999).

## DISCUSSION

### *I.    The Settlement Term Sheet Constitutes a Binding Agreement as to the Delivery of Thermal Coal*

Under New York law, there are two types of preliminary contracts: Type I and Type II agreements. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71-73 (2d Cir. 1989). Type I agreements are preliminary, "only in the sense that the parties desire a more elaborate formalization of the agreement." *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 150 (2d Cir. 2022). If the parties agree to all material terms, a Type I agreement can be binding, even if a more formal agreement with additional provisions and boilerplate remains to be negotiated. Type II agreements are those "that express[] mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Id.* The "ultimate issue" in determining whether there is a binding agreement is "'the intent of the parties: whether the parties intended to be bound, and if so, to what extent.'" *Id.* at 151 (citing *Vacold LLC v. Cerami*, 545 F.3d 114, 125 (2d Cir. 2008)). "The text of the agreement . . . is the most important consideration when determining how the parties intended to be bound," and an agreement can be considered a binding Type I agreement even when it "contemplates a final

5

contract that 'would include additional boilerplate'" unlikely to be disputed by the parties. *Id.* at 152 (citing *Vacold*, 545 F.3d at 129).

I hold that the Settlement Term Sheet in this case is a Type I agreement, in which the parties clearly expressed an intent to be bound by the terms of the agreement, were aligned on all material terms, and contemplated a final version of the agreement that would adhere to the terms of the Settlement Term Sheet.

Settlement agreements constitute enforceable contracts when "all material terms [are] set forth" and when there is a "manifestation of mutual assent." *Alvarez v. Cruz*, 159 N.Y.S.3d 812, 815 (N.Y. Sup. Ct. 2021) (quoting *Forcelli v. Gelco Corp.*, 109 A.D.3d 244, 248 (2d Dept. 2013)). The Settlement Term Sheet executed in January 2022 included express terms about the delivery of thermal coal, but price remained unclear. Additional fact discovery elucidated that the parties had agreed to set prices for thermal coal in three Thermal Coal Confirmations, produced during discovery, at the time of the settlement agreement: $48 per ton for Lex19(TP)0031; $34 per ton for Lex20(TP)0006; and $43 per ton for Lex21(TP)0001. The Settlement Term Sheet expressly "incorporate[ed] the[se] commercial terms" from the Thermal Coal Confirmations, and Lexington's own CEO and President, Jeremy Hoops, acknowledged that to be the case in his deposition. In its opposition to Plaintiffs' motion for summary judgment, Lexington conceded that the Settlement Term Sheet expressly incorporated the commercial terms agreed to by the parties, including the price of thermal coal.

Since the parties agreed to all material terms regarding product, delivery, and price of thermal coal in the Settlement Term Sheet, the Term Sheet is binding as to thermal coal, and summary judgment on this issue is granted.

### II.  The June 2022 Emails Between the Parties Constitute a Binding Modification of the Terms of Delivery of Metallurgical Coal

#### A. Both Parties Agreed to a Modification of the Terms of Delivery of Metallurgical Coal in the June 2022 emails

In my Order of February 28, 2023, I held that triable issues of fact remained regarding the effect of the June 2022 email exchange between the parties on the enforceability of the original Settlement Term Sheet: namely, whether the parties had the proper intent to be bound. ECF No. 90. Fact discovery in the form of depositions made it clear that the parties did intend to be bound, and Lexington then sought to change the agreements because of the changing price of coal and to re-open negotiations. *See* Dep. of Jeremy Hoops at 315-17, Ex. 3 to the Bell Decl., ECF No. 102. Meanwhile, the agreement that had been reached remained in effect.

In the original Settlement Term Sheet, the parties agreed to terms regarding the delivery of metallurgical coal and set the price at $130 per ton for the first delivery and $150 per ton for the optional second delivery. The parties intended to be bound by these delivery terms and prices at the time of execution, and it was thus an enforceable agreement. *See id.*; *see also Alvarez*, 159 N.Y.S.3d at 815.

"Under New York law, 'parties may modify a contract by another agreement.'" *Salto v. Alberto's Constr., LLC*, No. 17 Civ. 3583, 2020 U.S. Dist. LEXIS 135966, at *13 (S.D.N.Y. July 31, 2020) (citing *Kaplan v. Old Mut. PLC*, 526 App'x 70, 72 (2d Cir. 2013)). "Contract modification requires proof of each element requisite to the formation of a contract, including 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Kaplan*, 526 App'x at 72 (citing *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589). In their email dated June 2, 2022, sent while settlement re-negotiations were ongoing, Plaintiffs offered a new price for the delivery of metallurgical coal: $1,000,000. Defendant agreed to that price in its response email on June 6, 2022, stating

7

that it was "[i]n agreement" with the terms of the June 2 email. This agreement, assented to by both parties, constituted a valid and binding modification of the price term for metallurgical coal originally set in the signed Settlement Term Sheet.

### B. Consideration of the June 2022 Emails is Not Barred by the Federal Rules of Evidence or by the Parol Evidence Rule

Plaintiffs argue that the June 2022 emails should not be considered at all under Fed. R. Evid. 408 or under the parol evidence rule, and that the original terms of the Settlement Term Sheet as to metallurgical coal should be enforced. But the contract modification contained in the email exchange can be considered as evidence. Fed. R. Evid. 408(a)(2) bars evidence of compromise negotiations offered "to prove or disprove the validity or amount of a disputed claim," but such evidence can be considered "for another purpose." Fed. R. Evid. 408. Evidence of the email exchange between the parties, and for that matter, of the Settlement Term Sheet itself, is offered not to prove the parties' negotiating positions to resolve their underlying dispute, but to prove the culmination of the negotiations in an agreement. *See Westside Winery, Inc. v. SMT Acquisitions, LLC*, No. 19-cv-4371, 2022 U.S. Dist. LEXIS 168701, at *19 (E.D.N.Y. Sept. 19, 2022) (citing *In re Vidov*, 2014 Bankr. LEXIS 3268 *1, *6 (B.A.P. 9th Cir. July 31, 2014)) ("'It is well established that [Rule 408] does not exclude evidence related to a settlement when it is offered for the purposes of interpreting or enforcing the settlement'"). The parol evidence rule does not apply here either, because "the parol evidence rule does not bar evidence of *subsequent* negotiations, agreements or understandings offered to contradict, vary or modify the terms of the parties' written contract." *Cerveceria Modelo, S.A. de C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998, 2008 WL 3919186, at *2 (S.D.N.Y. Aug. 25, 2008) (emphasis in original). The contract modification as to the price of metallurgical coal agreed to by both parties in their June 2022 email exchange controls.

### *III.  The Parties Agreed to a Release of the Coal Marketing Agreement in the Settlement Term Sheet*

The Settlement Term Sheet also included a binding agreement that the parties would settle the claims relating to the Exclusive Coal Marketing Agreement in exchange for cash consideration of $750,000. The parties reaffirmed this term in the email exchange in June 2022, again agreeing to a payment of $750,000 in exchange for the release of the Exclusive Coal Marketing Agreement. This agreement released Lexington's counterclaims against Plaintiffs, which were based on the Exclusive Coal Marketing Agreement. Thus, all aspects of the parties' claims and counterclaim constituting the lawsuit have been settled and agreed to. Plaintiffs' Motion for Summary Judgment is granted.

### CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is granted. The Clerk shall terminate the motions, Dkt. Nos. 100 and 103. The parties shall settle the terms of a judgment declaring the parties' rights and obligations by September 30, 2024 and, in event of dispute, describe their agreements and disagreements in a single document.

SO ORDERED.

Dated:  September 23, 2024
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

9